**The PEOPLE of the State of Colorado, Complainant**

**v.**

**Dan Eldon MILLER, Respondent**

**Case Number: 17PDJ034**

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

NOVEMBER 30, 2017.

## OPINION AND DECISION IMPOSING SANCTIONS UNDER C.R.C.P. 251.19(b)

### WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE

Dan Eldon Miller ("Respondent") pleaded guilty to a misdemeanor charge of driving under the influence ("DUI"). Although this was Respondent's first DUI conviction and he caused no actual harm to himself or others, his conduct carried a risk of serious harm, especially because his blood alcohol content ("BAC") was measured at 0.254. The majority of the Hearing Board finds that Respondent's conduct violated Colo. RPC 8.4(b) and C.R.C.P. 251.5(b), warranting public censure. One member of the Hearing

1. The PDJ declined to admit the People's proposed exhibit 1.

2. *See* C.R.C.P. 251.1(b).

Board dissents, finding that Respondent did not transgress the Rules of Professional Conduct.

## I. PROCEDURAL HISTORY

On May 17, 2017, Bryon M. Large, Office of Attorney Regulation Counsel ("the People"), filed a complaint with Presiding Disciplinary Judge William R. Lucero ("the PDJ"), alleging that Respondent violated Colo. RPC 8.4(b) and C.R.C.P. 251.5(b). Through his counsel, Kevin C. Flesch, Respondent submitted his answer on June 20, 2017. A hearing was then set for October 5, 2017.

The People filed a motion seeking judgment on the pleadings on July 7, 2017. After considering Respondent's objection, the PDJ denied the People's motion. The PDJ concluded that the limited admitted facts in this matter were insufficient to find as a matter of law that Respondent violated Colo. RPC 8.4(b) and C.R.C.P. 251.5(b).

On October 5, 2017, a Hearing Board comprising the PDJ and lawyers Linda L. Ramirez-Eaves and Terry Rogers held a hearing under C.R.C.P. 251.18. Large represented the People, and Respondent appeared with Flesch. During the hearing, the Hearing Board considered the stipulation of facts, stipulated exhibit S1, and testimony from Respondent and Chad D. Emrick, Ph.D.[1]

## II. FACTS AND RULE VIOLATIONS

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 6, 1975, under attorney registration number 06675. He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in this disciplinary proceeding.[2]

### Findings of Fact[3]

Although Respondent practices real estate law from an office in Englewood, he regular-

3. Where not otherwise noted, these facts are drawn from testimony offered at the disciplinary hearing.

ly spends three or four nights a week at his mother's home in Silverthorne.[4] Respondent celebrated the 2016 New Year's holiday in Silverthorne. He testified that he ate brunch at a restaurant around 11:00 a.m., consuming two Bloody Marys. He drove to a different bar where he "probably had a couple more" drinks. After driving to an Irish pub, he consumed two glasses of wine before leaving around 4:00 p.m.[5]

When Respondent left the pub, he found that his car would not enter reverse. He drove to a Target store, hoping to purchase transmission fluid. Target did not have that product, so he drove to a nearby AutoZone. There, he bought transmission fluid and enlisted two employees to help with his car. One of the employees smelled alcohol on his breath and summoned the police.

Respondent was arrested at the AutoZone on suspicion of DUI. He cooperated with the authorities, he said, and consented to a blood alcohol test, which was performed at a local medical center at 5:36 p.m. that day. The results showed a BAC of 0.254.[6]

On September 14, 2016, Respondent pleaded guilty to a misdemeanor charge of DUI in Summit County Court case number 16T3.[7] This plea established that he drove a vehicle after he had consumed alcohol affecting him "to a degree that [he was] substantially incapable, either mentally or physically, or both mentally and physically, to exercise clear judgment, sufficient physical control, or due care in the safe operation of a vehicle." [8] This was Respondent's first DUI conviction. He was sentenced to twenty days of in-home confinement in addition to the following con-

ditions: 1) no violations of the law aside from traffic infractions; 2) no consumption of alcohol or illegal drugs; [9] 3) completing an alcohol evaluation and following recommendations therefrom; 4) sixty hours of community service; 5) eighteen months of alcohol monitoring; 6) twenty-four hours of level-two education and fifty-two hours of level-two therapy; and 7) an interlock system on his vehicle per Department of Motor Vehicles requirements.[10]

Respondent testified that his car was outfitted with an ignition interlock device in May 2016, to remain in place until May 2018. The device was designed to prevent his car from starting if he consumed alcohol. Respondent also explained that although his sentence formally included eighteen months of alcohol monitoring, he was not in fact monitored during his probation through any means such as random Breathalyzer tests. He testified, however, that in order to comply with the conditions of his bond and his probation, he drank no alcohol from the date he was charged until he completed probation in February 2017, when he resumed drinking, though at a reduced level.

Respondent testified that he reported his DUI conviction to the People. At the People's suggestion, he agreed to undergo an alcohol evaluation by Chad Emrick, Ph.D., an expert in psychology with a specialty in alcohol use disorders. As Dr. Emrick understood it, his task in the evaluation was to determine if Respondent had an alcohol use disorder or other related problems, and if so, to suggest how to address the disorder. This task, Dr.

4. Respondent's home address listed on his DUI case file is a Silverthorne address. Ex. S1.

5. Chad Emrick, Ph.D., the psychology expert in this case, estimated based on Respondent's BAC that he consumed approximately sixteen standard ethanol content drinks (a unit of measurement used in the field of psychology) in the hours before his arrest. Because the alcohol content of drinks served at a bar or restaurant can vary, Dr. Emrick said that Respondent "conceivably" could have ordered only six drinks the day he was arrested yet consumed in those drinks the amount of alcohol found in sixteen standard ethanol content drinks.

6. Although there was some suggestion during the hearing that a retest yielded a slightly lower

result, the Hearing Board received no testimony or other evidence of the retest, and in fact Respondent testified that he did not request a retest.

7. Stip. Facts ¶ 2; Ex. S1.

8. C.R.S. § 42-4-1301(1)(f).

9. The sentence order does not specify the duration of the first two conditions. Respondent testified that he understood the second condition, at least, to be in effect until he completed probation.

10. Ex. S1.

Emrick testified, included assessing how alcohol affected Respondent's overall health.

During the initial appointment in December 2016, Dr. Emrick recalled, Respondent appeared sincere, candid, respectful, and fully cooperative. In addition to assessing Respondent's mood and conducting a depression inventory, Dr. Emrick used a screening tool to assess Respondent's relationship with alcohol, taking into account his quantity and frequency of alcohol use as further described below, his physiological dependence on alcohol, and any life problems that he might have experienced based on his alcohol use. Respondent told Dr. Emrick that his drinking had not caused him any problems, except for elevated liver enzymes noted by his medical doctor.[11] About a week after the examination, Respondent submitted to prearranged breath and urine tests, which detected no alcohol or illegal drugs.[12] In addition, Dr. Emrick contacted three "collateral informants" identified by Respondent. These friends and acquaintances corroborated Respondent's report that he had abstained from alcohol since his arrest, though Dr. Emrick noted that he generally prefers to speak with informants who have a closer relationship to the examinee than did the informants Respondent designated.[13]

Critical to Dr. Emrick's assessment was Respondent's reported history of alcohol consumption. Respondent told Dr. Emrick that when he first began working as a lawyer at a downtown Denver firm in 1975, he fell into a general pattern of drinking two or three glasses of wine every weekday at lunch with his colleagues. Respondent explained to the Hearing Board that this was "how business was done, that it was done over lunch or dinner with cocktails, and that was how deals were hammered out." During that period, he also consumed three or four alcoholic drinks after work, as well as one or two drinks in the evening. In general, he had a total of six to eight alcoholic drinks per day—a pattern that continued after he formed his own law firm as a solo practitioner in the mid-1990s, and up until his arrest on January 1, 2016.

When Dr. Emrick asked Respondent during the evaluation whether he planned to resume drinking after his probation ended, Respondent replied that he was not sure. Dr. Emrick said that he has never before heard such a response in an alcohol evaluation—the response is "always no."

After completing the evaluation, Dr. Emrick diagnosed Respondent with alcohol use disorder, mild, in early remission.[14] Dr. Emrick expected that it would be a challenge for Respondent to resume drinking at only a moderate level. According to Dr. Emrick, scientific standards call for men aged sixty-five or older to consume no more than seven standard ethanol content drinks in any seven-day period. Because Respondent had consumed substantial quantities of alcohol on a daily basis for several decades, Dr. Emrick said, normal biological adaptation processes would likely make it very difficult for Respondent to maintain a pattern of drinking at the recommended level. Dr. Emrick testified that when a person with a history of heavy

11. Dr. Emrick did not obtain any medical records reflecting Respondent's elevated liver enzymes or any other physiological effects of Respondent's alcohol consumption.

12. Dr. Emrick testified that the breath test determined only that Respondent had consumed no alcohol in the twelve- or twenty-four-hour period leading up to the test. The urine test would have detected drugs that Respondent had consumed up to several weeks before the test. Dr. Emrick said he had no reason to suspect that Respondent was using illegal drugs.

13. Dr. Emrick said that he considered the nature of Respondent's somewhat attenuated relationship with the informants, while also noting that sometimes an examinee simply does not have the type of relationship with close friends or family that would allow for their designation as informants.

14. Dr. Emrick's diagnosis took into account both Respondent's approximately year-long abstinence from alcohol at the time of the examination and his relationship with alcohol during the year preceding the period of abstinence. Dr. Emrick stated that the official scale for alcohol use disorders ranges from mild to severe. He told the Hearing Board that he does not generally use the term "alcoholic," but use of this term in his professional community is limited to persons who drink extremely large amounts, are highly dependent on alcohol, and experience a wide array of life problems associated with alcohol—descriptors that Dr. Emrick does not believe apply to Respondent.

drinking resumes drinking, the body typically readapts within two or three days to the level of alcohol that the person was previously habituated to consuming. As noted below, however, Respondent reported at the disciplinary hearing that he has succeeded in maintaining a significantly lower level of alcohol consumption since his probation ended in February 2017.

Dr. Emrick recommended that Respondent begin to meet quarterly with an alcohol expert and undergo monitoring of his relationship with alcohol.[15] If Respondent demonstrated continued abstinence from alcohol, Dr. Emrick said, Respondent would require no further monitoring or treatment. But if Respondent were not abstaining from alcohol or not able to drink at a moderate level, Dr. Emrick said, Respondent should enter an intensive outpatient alcohol program for alcohol use problems, followed by outpatient counseling until such time as a therapist determined treatment was no longer necessary.[16] Dr. Emrick did not clearly state the goal of the monitoring and treatment recommendations, nor did he indicate that these measures were necessary to ensure that Respondent could competently practice law or avoid future instances of drunk driving.

At the disciplinary hearing, Respondent averred that his pattern of drinking has "dramatically" changed since his arrest. He did resume drinking after his probation ended. But because of the interlock device, he said, he drinks mostly on the weekend and sometimes in the evening. He also attested that, regardless of the presence of the interlock, he understands that he must not drink and drive. He said he often has to drive places for work, so he knows he cannot generally drink at lunch or otherwise during the day. He said that his lunch partners understand why he can no longer drink with them. When asked whether his drinking habits will evolve once the interlock is removed from his vehicle, he replied that he "gets the part" about drinking and driving, which is "done." As to his larger pattern of drinking, he said he learned through court-ordered alcohol education that using alcohol is not a "good way to cope with problems," though he suggested that his court-ordered education and therapy was not particularly useful as a whole.

Respondent does not agree with Dr. Emrick's opinion that he requires an additional period of monitored sobriety or treatment. He believes he does not need constant supervision of his drinking habits, which are "under control" and "within healthy limits." Although he conceded that before his arrest he used to engage in unsafe behavior by drinking and driving, Respondent insisted that his drinking has never affected his practice of law or otherwise gotten him "into trouble." He said that he drank with clients at times, but clients never indicated that he drank too much. When his law practice required him to attend court, he said, he never went to court intoxicated. Respondent emphasized that he has never been disciplined in his lengthy legal career, nor have the People raised any concerns relating to his law practice in this matter.

Respondent further testified that he believes retirement is a viable choice at this stage of his career. When asked whether he would prefer to continue drinking over continuing to practice law, he replied that he could not answer the question with a simple "yes" or "no." He said that alcohol is not as important to him as it once was, but that he also has items on his bucket list that involve

**15.** In his written report, which was not entered into evidence, Dr. Emrick recommended that Respondent begin following these monitoring and treatment measures in May 2018. In identifying this timeframe, Dr. Emrick relied on a mistaken belief that Respondent's probation would terminate when the interlock device was removed from his car, in May 2018. At the disciplinary hearing, Dr. Emrick said that he had meant to recommend that Respondent begin to follow the identified monitoring and treatment measures when Respondent's probation ended and he was no longer required to abstain from alcohol. It is unclear from the testimony what

duration Dr. Emrick believed was appropriate for this monitoring program.

**16.** Respondent testified that he attended two Alcoholics Anonymous ("AA") meetings in December 2016 or January 2017. He concluded that AA was "not appropriate" for him because he believed that the meetings involved a lot of "woe is me" and that participating in AA might even worsen his relationship with alcohol. Based on Respondent's views, Dr. Emrick agreed that AA was not a good fit for Respondent.

drinking alcohol, such as visiting wine country in France and California. Respondent believes he should be allowed to make his own decisions about consuming alcohol.

## Legal Analysis

The People contend that Respondent violated Colo. RPC 8.4(b) and committed acts constituting grounds for discipline under C.R.C.P. 251.5(b). Colo. RPC 8.4(b) states that it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, while C.R.C.P. 251.5(b) provides that such conduct is grounds for discipline.[17] The comments to Colo. RPC 8.4(b) state that

a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses including violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.[18]

In accordance with the plain language of the rule and its comment, courts have found that only a certain subset of criminal conduct by lawyers implicates Rule 8.4(b). For example, driving without auto insurance and driving with a suspended license, standing alone, have been found not to violate the rule.[19] The Colorado Supreme Court has not set forth any framework governing when crimes not involving violence or dishonesty should be

said to reflect adversely on a lawyer's fitness to practice.[20]

The Colorado Supreme Court has previously found Colo. RPC 8.4(b) violations in a number of cases in which lawyers were convicted of DUI.[21] In one such case, *People v. Rotenberg*, the Colorado Supreme Court commented that "[a] conviction for driving under the influence of intoxicating liquor adversely reflects on the [ ] respondent's fitness to practice law."[22] The People argue that under Colorado case law, Respondent's DUI conviction is a per se violation of Colo. RPC 8.4(b).[23]

Respondent, meanwhile, argues that the Colorado Supreme Court has never held that a DUI conviction, standing alone, necessarily amounts to a violation of Colo. RPC 8.4(b). According to Respondent, all cases in which the Colorado Supreme Court has disciplined attorneys for DUI convictions involved additional misconduct or harm, such as causing an accident while driving drunk. Thus, he asserts, the Colorado Supreme Court's prior statement about DUI convictions adversely reflecting on fitness to practice law must be considered dicta, and this Hearing Board must independently assess the facts of this case. Because this is a first-time offense, no harm was caused, his clients have not been affected by his drinking, and he has successfully completed probation, Respondent argues that he should not be found to have violated Colo. RPC 8.4(b).

The Hearing Board does not agree with the People that Respondent's DUI conviction is a per se rule violation.[24] The Colorado Supreme Court has generally ruled law-

---

**17.** Our analysis of the two alleged rule violations is one and the same, so we simply refer in this section to Colo. RPC 8.4(b).

**18.** Colo. RPC 8.4(b) cmt 2.

**19.** *In re Parks*, 9 So.3d 106, 111 (La. 2009); *State ex rel. Okla. Bar Ass'n v. Whitworth*, 183 P.3d 984, 990 (Okla. 2008).

**20.** At least two courts have stated that "[p]ertinent considerations [in determining whether conduct implicates Rule 8.4(b)] include the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a vic-

tim; and the presence or absence of a pattern of criminal conduct." *Iowa Supreme Court Attorney Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 767 (Iowa 2010) (quoting *In re Conduct of White*, 311 Or. 573, 815 P.2d 1257, 1265 (Or. 1991)).

**21.** *See, e.g., In re Kearns*, 991 P.2d 824, 825-26 (Colo. 1999); *People v. Fahselt*, 807 P.2d 586, 586-87 (Colo. 1991).

**22.** 911 P.2d 642, 643 (Colo. 1996).

**23.** *See, e.g., id.*

**24.** As noted above, the PDJ previously refused to grant judgment on the pleadings in this matter.

yers in violation of Colo. RPC 8.4(b) where the lawyers' convictions were directly linked to other misconduct or harm,[25] and the court's broad statement in *Rotenberg* was not part of an analysis of Colo. RPC 8.4(b).[26] Nevertheless, the Hearing Board finds that persuasive authorities strongly counsel for finding that Respondent violated Colo. RPC 8.4(b). Reading the case law as a whole, the Hearing Board interprets the general tenor of the Colorado Supreme Court's holdings and commentary as reflecting a perspective that DUI often reflects negatively on a lawyer's fitness to practice.[27] Based on that case law and the circumstances presented here, the Hearing Board finds that Respondent did transgress Colo. RPC 8.4(b).

In reaching this conclusion, we recognize that Respondent's DUI did not directly affect clients. This fact is not determinative, however, because the Colorado Supreme Court has ruled that non-client-centered conduct, such as domestic violence, can adversely reflect on a lawyer's fitness to practice.[28] We also recognize that not all misdemeanor convictions of a lawyer signal the level of

indifference to legal obligation that reflects adversely on the lawyer's professional fitness. But we find circumstances present here that warrant such a finding. Respondent knowingly drove with a strikingly high BAC,[29] and he acknowledged that he had driven while intoxicated in the past. Indeed, Dr. Emrick testified that according to estimates commonly used in his field, the average person will have driven drunk roughly eighty times before being arrested for DUI. Even though Respondent was not previously convicted of DUI, his extreme intoxication while driving on New Year's Day of 2016 and his past pattern of drunk driving indicate indifference to fundamental legal obligations and to the public. DUI offenses are something of a special category of crime: drunk driving carries a significant risk of causing serious injury or death, and drunk driving is a crime that is both unprovoked and avoidable. Unlike many other misdemeanor offenses, then, drunk driving—at least with a BAC as elevated as was Respondent's—signals a degree of callousness to the public and our body of criminal laws that casts doubt on a lawyer's commitment to faithfully respect

**25.** *See, e.g., In re Kearns*, 991 P.2d at 825-26 (approving a decision to discipline a lawyer who struck a motorcyclist while driving with a BAC of 0.161, causing the motorcyclist life-threatening injuries and leading to convictions of DUI and felony vehicular assault); *People v. Myers*, 969 P.2d 701, 701 (Colo. 1998) (in a case of default, disciplining a lawyer who drove under the influence of alcohol and then failed to appear at her criminal trial on those charges); *Rotenberg*, 911 P.2d at 643 (approving a stipulation to a violation of Colo. RPC 8.4(h)—a rule that at the time proscribed any conduct adversely reflecting on a lawyer's fitness to practice law—where a lawyer had multiple alcohol-related driving violations, including for an incident in which, while drunk, he took a client moped-riding and then rear-ended the client, causing her "serious bodily injury"); *Fahselt*, 807 P.2d at 586-87 (disciplining a lawyer who admitted that he engaged in conduct adversely reflecting on his fitness to practice under Colo. RPC 8.4(h) after he caused an auto accident while driving drunk, resulting in serious injuries to others).

**26.** The parties in *Rotenberg* stipulated that the lawyer violated Colo. RPC 8.4(h), and the court's statement was made in deciding whether to approve the parties' stipulated sanction. 911 P.2d at 642-43. Thus, the statement is not controlling precedent. *See Main Elec., Ltd. v. Printz Servs. Corp.*, 980 P.2d 522, 526 (Colo. 1999). Many other Colorado opinions disciplining lawyers for DUI convictions are cases approving stipulations, so these cases carry only persuasive force. *See In re Dann*, 136 Wash.2d 67, 960 P.2d 416, 423 (1998).

**27.** *See, e.g., Rotenberg*, 911 P.2d at 643 (in approving a stipulation and approving a proposed public censure, commenting that "[a] conviction for driving under the influence of intoxicating liquor adversely reflects on the [] respondent's fitness to practice law"); *Fahselt*, 807 P.2d at 588 (stating that a lawyer's operating of a vehicle without insurance while intoxicated and injuring innocent parties "is serious misconduct," "is a failure to maintain personal integrity," and "reflects upon the respondent's fitness to practice law"). As already noted, the Colorado Supreme Court's decisions to approve disciplinary stipulations, though not binding, are persuasive authority. *See Dann*, 960 P.2d at 423.

**28.** *See, e.g., In re Hickox*, 57 P.3d 403, 404 (Colo. 2002).

**29.** In most cases disciplining lawyers for DUI convictions, the BAC of the lawyer in question was notably lower than Respondent's. *See, e.g., In re Kearns*, 991 P.2d at 825 (BAC of 0.161); *Myers*, 969 P.2d at 702 (BAC of 0.117); *Rotenberg*, 911 P.2d at 642 (BAC of 0.184); *Fahselt*, 807 P.2d at 586 (BAC of 0.122).

the welfare of others and the interests of the legal system.[30]

▮ Further, although we are not aware of cases publicly disciplining lawyers under factual circumstances mirroring those present here, we do find highly persuasive cases from other jurisdictions where lawyers were disciplined for one-time DUI offenses that caused injury or potential injury.[31] When a person drives with a BAC as high as Respondent's was on January 1, 2016, the person always risks injuring others. As established by his conviction, Respondent was "substantially incapable ... [of] exercis[ing] clear judgment, sufficient physical control, or due care in the safe operation of a vehicle" when he chose to drive drunk.[32] Respondent and the public were both fortunate that his drunk driving did not cause any accident or other injury, but a lawyer should not escape discipline on the sheer basis of good luck. To decide disciplinary cases in a fair and proportionate manner, DUI offenses by lawyers generally should yield consistent analysis under Rule 8.4(b) regardless of the injury caused.[33] Accordingly, the Hearing Board finds that Respondent transgressed Colo. RPC 8.4(b) and C.R.C.P. 251.5(b).

### III. SANCTIONS

▮ The American Bar Association *Standards for Imposing Lawyer Sanctions* ("ABA *Standards*")[34] and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[35] When imposing a sanction after a finding of lawyer misconduct, a hearing board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty*: Respondent's violation of Colo. RPC 8.4(b) and C.R.C.P. 251.5(b) represented a dereliction of his duties owed to the public.

▮ *Mental State*: DUI is a strict liability offense,[36] so Respondent's conviction does not establish any particular mental state as a matter of law. The Hearing Board finds that Respondent knowingly drove while intoxicated, however. Respondent was charged with understanding the criminal laws, and particularly given his high BAC, we find that he must have been aware of his state of intoxication.

*Injury*: Although Respondent caused no concrete harm to others, his decision to drive drunk carried a risk of serious harm to the public.[37] In addition, his conviction reflects

---

**30.** *See* C.R.C.P. 208.1(5)(e)-(f) (providing that "[t]he ability to conduct oneself with respect for and in accordance with the law" and "[t]he ability to exhibit regard for the rights and welfare of others" are among the essential eligibility requirements evaluated in determining whether applicants to practice law in Colorado have the requisite character and fitness).

**31.** *See, e.g., Ky. Bar Ass'n v. Jones*, 759 S.W.2d 61, 62 (Ky. 1988) (finding that a lawyer should be disciplined for conduct adversely reflecting on fitness to practice when the lawyer was convicted of felony reckless homicides after driving drunk); *In re Bratton*, 33 N.Y.S.3d 743, 743-44, 141 A.D.3d 182 (N.Y. App. Div. 2016) (finding that a lawyer engaged in illegal conduct that adversely reflected on his fitness as a lawyer, warranting public censure, where the lawyer had driven the wrong direction down a parkway while intoxicated, leading to convictions of DUI and reckless endangerment but causing only potential injury); *Office of Disciplinary Counsel v. Michaels*, 38 Ohio St.3d 248, 527 N.E.2d 299, 299-301 (1988) (finding that a lawyer engaged in conduct adversely reflecting on fitness to prac-

tice when, with a BAC of 0.212, he caused an automobile accident that resulted in several serious injuries, one fatal).

**32.** C.R.S. § 42-4-1301(1)(f).

**33.** *See Attorneys, New York Driving While Intoxicated* § 35:30 (2d ed. Dec. 2016) (noting a shift in disciplinary authorities' handling of lawyers' DUI convictions and suggesting that misdemeanor DUI offenses merit discipline).

**34.** Found in ABA *Annotated Standards for Imposing Lawyer Sanctions* (2015).

**35.** *See In re Roose*, 69 P.3d 43, 46-47 (Colo. 2003).

**36.** *See* C.R.S. § 42-4-1301; *People v. Senn*, 824 P.2d 822, 824 (Colo. 1992).

**37.** *See, e.g., In re Steiner*, 817 A.2d 793, 797 (Del. 2003) (noting the possibly "devastating" consequences of drunk driving).

adversely on the legal profession.[38]

## ABA *Standards* 4.0-7.0—Presumptive Sanction

The ABA *Standards* do not squarely address the conduct at issue in this case. Three standards are arguably applicable. ABA *Standard* 5.12 states that suspension is generally warranted when a lawyer knowingly engages in criminal conduct that does not involve the elements listed in ABA *Standard* 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.[39] ABA *Standard* 5.13 provides that public censure is the presumptive sanction when a lawyer knowingly engages in conduct that does not contain the elements listed in ABA *Standard* 5.11 yet that involves dishonesty, fraud, deceit, or misrepresentation, and that adversely reflects on the lawyer's fitness to practice. And ABA *Standard* 5.14 states that private admonition "is generally appropriate when a lawyer engages in any other conduct that adversely reflects on the lawyer's fitness to practice law."

Although the People assert that the presumptive sanction here is suspension, DUI offenses have not been deemed in Colorado to "seriously" adversely reflect on a lawyer's fitness to practice law.[40] Thus, the Hearing

Board must determine whether the most fitting presumptive standard is ABA *Standard* 5.13 or ABA *Standard* 5.14.[41] On the one hand, *Standard* 5.13 specifically calls out conduct that involves dishonesty, fraud, deceit, or misrepresentation, none of which are present in this case. On the other hand, to apply *Standard* 5.14 here would seem inconsistent with the overall thrust of *Standard* 5.0, given that *Standard* 5.14, by its plain terms, speaks to conduct that is not necessarily knowing or criminal in nature. Respondent's misconduct was both knowing and criminal.[42] We thus apply *Standard* 5.13, and proceed with our analysis based on the understanding that the presumptive sanction is a public censure.[43]

## ABA *Standard* 9.0—Aggravating and Mitigating Factors

■ Aggravating circumstances include any considerations that may justify an increase in the degree of the sanction to be imposed, while mitigating factors may warrant a reduction in the severity of the sanction.[44] As explained below, we apply two factors in aggravation, one of which carries relatively little weight. We also apply three mitigating factors, two of which merit comparatively little weight and one of which carries substantial weight.

**38.** *See In re Curran*, 115 Wash.2d 747, 801 P.2d 962, 968 (1990) (commenting in a disciplinary case involving DUI that "violations of the law by lawyers contribute to erosion of respect for legal institutions and the law").

**39.** The elements listed in *Standard* 5.11 include dishonesty, theft, sale of controlled substances, intentional killing, and other elements that do not apply here.

**40.** *In re Kearns*, 991 P.2d at 826; *Fahselt*, 807 P.2d at 588.

**41.** In past disciplinary cases involving DUI, the Colorado Supreme Court has not used a strict approach in identifying a presumptive standard, which signals that DUI offenses are not necessarily pegged to either *Standard* 5.13 or *Standard* 5.14. *In re Kearns*, 991 P.2d at 826-27; *Fahselt*, 807 P.2d at 588. We believe that *Standard* 5.13 is properly applied to cases involving DUI convictions, even though the standard's language is not directly on point. As explained in the *Annotated Standards for Imposing Lawyer Sanctions*, "[i]f the criminal misconduct [at issue] is deemed to only 'adversely' reflect on fitness to practice law

and not 'seriously adversely' reflect on fitness, courts may apply a [standard other than *Standard* 5.12]—often *Standard* 5.13." *Annotated Standards for Imposing Lawyer Sanctions* at 258.

**42.** We also note that only "minimal infractions"—not, in our view, an accurate descriptor of Respondent's conduct—normally warrant a private admonition under the ABA *Standards*. *Annotated Standards for Imposing Lawyer Sanctions* at 269 ("Courts will impose minimal discipline—that is, a private admonition—in cases involving a minimal infraction."); *see also id.* at 74 ("Admonition should be used only in cases of minor misconduct....").

**43.** Application of *Standard* 5.13 is consistent with *Myers*, in which the Colorado Supreme Court commented that if the only misconduct at issue had been drunk driving, "a public censure might be appropriate." 969 P.2d at 702. Although the rule analysis in *Myers* carries no precedential value because the respondent had defaulted, the Hearing Board views the sanctions analysis in that case as persuasive.

**44.** *See* ABA *Standards* 9.21 & 9.31.

## Aggravating Factors

*Substantial Experience in the Practice of Law—9.22(i):* Respondent has practiced law for four decades. His extensive experience as an attorney has limited relevance to his conviction, however, since legal experience does not necessarily make such misconduct less likely.[45] We thus consider this factor in aggravation but accord it relatively little significance in our analysis.

*Illegal Conduct—9.22(k):* That Respondent's conduct was illegal merits weight in aggravation.

## Mitigating Factors

*Absence of Prior Disciplinary Record—9.32(a):* We consider in mitigation the fact that Respondent has not been disciplined in the course of his lengthy legal career. We assign relatively little weight to this factor, however, because Respondent testified that he previously had driven drunk without being caught—testimony consistent with Dr. Emrick's statement that the average person will have driven drunk roughly eighty times before being arrested for DUI.

*Full and Free Disclosure in Proceeding and Cooperative Attitude Toward Proceeding—9.32(e):* The Hearing Board found Respondent to be remarkably candid in the course of this proceeding, both in his communications with Dr. Emrick and in his testimony at the hearing. Respondent told the unvarnished truth in multiple instances when it arguably would have been to his advantage to dissemble. Indeed, in response to a Hearing Board query, the People conceded that Respondent's apparent honesty warrants substantial weight in mitigation. The Hearing Board thus awards him such credit.

*Imposition of Other Penalties or Sanctions—9.32(k):* We consider that Respondent served twenty days of in-home confinement and completed probationary conditions. But we assign relatively little weight to this factor, because his sentence was not particularly onerous.

## Analysis Under ABA *Standards* and Case Law

▮▮▮ The Colorado Supreme Court has directed the Hearing Board to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors.[46] We are mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases." [47] Though prior cases are helpful by way of analogy, hearing boards must determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis. The Colorado Supreme Court has suggested that cases predating the 1999 revision to this state's disciplinary system carry less precedential weight than more recent cases.[48]

The People ask the Hearing Board to impose public discipline—either a suspension or public censure—with a condition of monitored sobriety. Respondent, meanwhile, objects to any discipline, including a continued monitoring requirement.

The Hearing Board has not identified any cases in Colorado or other jurisdictions with factual patterns closely mirroring the circumstances here. The Colorado Supreme Court has publicly censured lawyers based on circumstances more aggravated than those present here, such as in *Kearns* and *Fahselt*.[49] In *Kearns* and *Fahselt*, however, miti-

---

45. *Cf. In re Hickox,* 57 P.3d at 407 (finding a lawyer's substantial experience irrelevant to his domestic violence offense "since greater or lesser experience would not necessarily make the misconduct at issue [ ] less likely").

46. *See In re Attorney F.,* 285 P.3d at 327; *In re Fischer,* 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

47. *In re Attorney F.,* 285 P.3d at 327 (quoting *In re Rosen,* 198 P.3d 116, 121 (Colo. 2008)).

48. *Id.*

49. *In re Kearns,* 991 P.2d at 825-26 (approving a decision to publicly censure a lawyer who struck a motorcyclist while driving with a BAC of 0.161, causing the motorcyclist life-threatening injuries and leading to a conviction of DUI and felony vehicular assault); *Fahselt,* 807 P.2d at 586-87 (approving a stipulation to publicly censure a lawyer who was convicted of DUI and felony

gating factors significantly predominated, so we adjudge those cases to be comparable with the instant case.[50] We thus find that Colorado case law supports the imposition of public censure under the facts presented here.[51]

Returning to the framework set forth in the ABA *Standards*, we must consider the presumptive sanction for Respondent's misconduct and then determine whether aggravating or mitigating factors call for adjustment of that sanction—an analysis that may be informed by relevant case law. Here, the presumptive sanction is public censure. The aggravating and mitigating factors are roughly balanced, such that a departure from the presumptive sanction is not warranted. Nor does the case law counsel in favor of imposing a different sanction here. Thus, we conclude that public censure is warranted.

The remaining question is whether to attach any conditions to Respondent's discipline, as the People request. Neither the ABA *Standards* nor case law provide meaningful guidance as to imposition of conditions. Although Respondent's greatly elevated BAC led us to seriously consider imposing conditions, we find that the period of monitored sobriety requested by the People is overbroad given the evidence in this case. Respondent was diagnosed only with a mild alcohol use disorder, and there is no suggestion that monitoring is needed to prevent future instances of drunk driving. Instead, Dr. Emrick's recommendation of monitored sobriety appears to be primarily rooted in concerns about Respondent's personal health, which is outside the purview of the Hearing

Board. We conclude that the People simply have not met their burden to establish by clear and convincing evidence the need for conditions in this case.

## IV. CONCLUSION

By driving with a BAC of 0.254, Respondent committed a criminal act that reflects adversely on his fitness as a lawyer. Respondent's decision to drive while intoxicated posed a risk of significant harm to the public. The legal profession cannot ignore conduct representing this degree of indifference to fundamental legal obligations and to the public good. Respondent is thus publicly censured.

## V. ORDER

The Hearing Board therefore **ORDERS**:

1. **DAN ELDON MILLER**, attorney registration number 06675, is **PUBLICLY CENSURED**. The public censure will take effect upon issuance of an "Order and Notice of Public Censure."[52]

2. The parties **MUST** file any posthearing motion or application for stay pending appeal with the Hearing Board **on or before Thursday, December 14, 2017**. Any response thereto **MUST** be filed within seven days.

3. The parties **MUST** file any application for stay pending appeal **on or before Thursday, December 21, 2017**. Any response thereto **MUST** be filed within seven days.

vehicular assault after causing an auto accident that resulted in severe injury).

**50.** *In re Kearns*, 991 P.2d at 825-26 (applying at least five mitigating factors and no aggravators); *Fahselt*, 807 P.2d at 586-87 (applying at least six mitigating factors and no aggravators).

**51.** We note that a hearing board more recently suspended a lawyer for two years after the lawyer killed a motorcyclist while driving drunk. *People v. Miranda*, 168 P.3d 11, 13 (Colo. O.P.D.J. 2007). Although hearing board opinions are not precedential, this case may reflect an increased recognition of the serious risks posed by drunk driving and the need for meaningful discipline. *See also* William Zeb Meadows, "At-

torney Conduct in the Operation of A Motor Vehicle As Grounds for Professional Discipline," 18 J. LEGAL PROF. 417, 424 (1993) (observing that an increasing number of attorneys are facing disciplinary consequences as a result of serious driving offenses). We also note that Colorado recently made conviction of a fourth alcohol-related traffic offense a felony, also signaling a growing awareness of the risks of drunk driving. C.R.S. § 42-4-1301(1)(A).

**52.** In general, an order and notice of sanction will issue thirty-five days after a decision is entered under C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

4. Respondent **SHALL** pay the costs of this proceeding. The People **SHALL** submit a statement of costs **on or before Thursday, December 14, 2017.** Any response thereto **MUST** be filed within seven days.

HEARING BOARD MEMBER TERRY ROGERS, dissenting:

Although I concur with the majority's factual findings in this case, I dissent from the majority's determination that Respondent violated the Rules of Professional Conduct.

In analyzing this matter, the Hearing Board conducted extensive research of disciplinary case law involving DUI convictions. We were unable to identify any public case in Colorado or any other jurisdiction in which a lawyer was held to have violated Rule 8.4(b) under circumstances analogous to the instant case, that is, where the lawyer was convicted of a one-time misdemeanor DUI offense, where no actual harm was caused, and where no attendant criminal or professional misconduct was committed. In other words, lawyers' DUI convictions have been deemed to adversely reflect on fitness to practice law only where other aggravating circumstances have also been present.[53]

One of the leading treatises on professional ethics states that "a lawyer guilty of just one [incident of driving while intoxicated or reckless driving]—even a serious one—ought not to be disciplined."[54] Moreover, a number of courts have specifically found that DUI offenses did not adversely reflect on lawyers' fitness to practice. Those cases focused on the lack of a relationship between the offense and the lawyer's practice of law. For example, the Kansas Supreme Court ruled that a lawyer's arrest for DUI did not adversely reflect on the lawyer's fitness to practice, reasoning that the lawyer was not representing a client at the time of his arrest and stating that "[w]hile appreciative of changing values within our society, it would appear that our legislature has enacted adequate laws to control and punish the offense of driving while intoxicated."[55] In a similar vein, the Indiana Supreme Court ruled that a lawyer's drunk driving did not adversely reflect on his fitness to practice law where the misconduct was a first offense and his courtroom behavior was professional.[56] In that opinion, the court indicated that the relevant inquiry was whether a nexus existed between the misconduct and the lawyer's fitness to practice, as measured by whether the lawyer "can be trusted to keep his client's secrets, give effective legal advice, fulfill his obligation to the courts, and so on."[57] Similarly, the Oklahoma Supreme Court opted for a close examination of the circumstances of a DUI conviction for purposes of determining whether a lawyer's "use of alcohol impairs or tends to impair his ability to conduct efficiently and properly the affairs undertaken for a client in the practice of law."[58] The Supreme Courts of Washington and Wisconsin have issued comparable decisions.[59]

Applying the standard of clear and convincing evidence, Respondent's conduct does not fall within the plain language of Colo. RPC 8.4(b) or the framework for finding rule

53. *See, e.g., In re Kearns,* 991 P.2d at 825-26; *Myers,* 969 P.2d at 701; *People v. Van Buskirk,* 962 P.2d 975, 975 (Colo. 1998); *People v. Madrid,* 967 P.2d 627, 627-28 (Colo. 1998); *People v. Shipman,* 943 P.2d 458, 459 (Colo. 1997); *Rotenberg,* 911 P.2d at 643; *Fahselt,* 807 P.2d at 586-87; *see also Jones,* 759 S.W.2d at 62; *Michaels,* 527 N.E.2d at 299-301.

54. 2 Geoffrey C. Hazard, Jr., W. William Hodes, & Peter R. Jarvis, *The Law of Lawyering,* § 69.04, at 69-13 (4 th ed. 2015).

55. *Matter of Morris,* 251 Kan. 592, 834 P.2d 384, 386 (Kan. 1992).

56. *Matter of Oliver,* 493 N.E.2d 1237, 1242-43 (Ind. 1986).

57. *Id.* at 1242.

58. *State ex rel. Okla. Bar Ass'n v. Armstrong,* 791 P.2d 815, 815-19 (Okla. 1990); *see also State ex rel. Okla. Bar Ass'n v. McBride,* 175 P.3d 379, 385 (Okla. 2007) ("conviction for DUI does not facially demonstrate a lawyer's unfitness to practice law").

59. *In re Curran,* 801 P.2d at 972 (accepting a hearing examiner's conclusion that a lawyer did not violate Rule 8.4(b) through his conviction for vehicular homicide while intoxicated); *In re Johns,* 353 Wis.2d 746, 847 N.W.2d 179, 188 (2014) (concluding that a lawyer's conviction for vehicular homicide while intoxicated did not violate Rule 8.4(b)).

violations set forth in relevant case law.[60] The rule requires a finding that the offense at issue affects the lawyer's "fitness to practice law"—a phrase implicating the lawyer's capacity to fulfill his or her professional obligations in representing clients. A one-time misdemeanor conviction alone does not demonstrate an attorney's unfitness to practice. This principle is implied in comment 2 to Colo. RPC 8.4(b):

> Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

No evidence was presented that Respondent's conviction for a single DUI or his use of alcohol indicates an indifference to legal obligation. On the contrary, the evidence shows that Respondent's fitness to practice has never been at issue. His clients are satisfied with his representation and he has no disciplinary history. The evidence also shows that Respondent has practiced law for forty-two years and has never had an alcohol violation in that entire time. Dr. Emrick's recommendations were primarily directed toward Respondent's health, rather than ensuring Respondent can safely practice law. Respondent's health is simply not a matter within the purview of the Hearing Board. Thus, none of the circumstances present in cases where lawyers have been found in violation of Colo. RPC 8.4(b) are present here: Respondent engaged in no pattern of criminal conduct, he caused no actual injury to others, and he committed no attendant misconduct.

The majority's analysis is founded on the argument that Respondent's single DUI conviction represents an unacceptable indifference to legal obligation. But this approach to analyzing the rule has been rejected by several courts. If a Colo. RPC 8.4(b) violation can be premised solely on a single misdemeanor conviction, the plain language of the rule will be rendered superfluous [61] and low-level misdemeanor offenses of any type will always form the basis for discipline.[62]

The result the People request is at odds with precedent. The Colorado Supreme Court has generally publicly sanctioned lawyers for DUI convictions only where those convictions were directly connected to other misconduct or harm.[63] The Colorado Su-

---

**60.** *See Templeton*, 784 N.W.2d at 767 (requiring a "rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law"); *In re White*, 815 P.2d at 1265 (same); *see also In re Curran*, 801 P.2d at 969 ("In determining which criminal conduct reflects disregard for the rule of law requiring bar discipline to supplement criminal sanctions, the bar association should consider two factors— the frequency of violation, and the seriousness of the injury caused.").

**61.** *See People v. Cross*, 127 P.3d 71, 73 (Colo. 2006) (noting that statutory interpretations that render words or phrases superfluous should be rejected).

**62.** *See The Law of Lawyering*, § 69.04, at 69-13 (stating that the argument that "the commission of *any* crime reflects badly on a lawyer's honesty or his fitness ... because honest people do not commit crimes and criminals do not make good lawyers.... does not recognize, as the criminal law does, that even among serious crimes the degree of immorality involved may differ and so may implications about the offender's character and capacity to cause more harm in the future.").

**63.** *See, e.g., In re Kearns*, 991 P.2d at 825-26; *Myers*, 969 P.2d at 701; *Rotenberg*, 911 P.2d at 643; *Fahselt*, 807 P.2d at 586-87.

preme Court's statement in *Rotenberg* did not form part of an analysis of Colo. RPC 8.4(b).[64] The parties in *Rotenberg* stipulated that the lawyer had violated Colo. RPC 8.4(h), and the court's statement was made in the course of evaluating the parties' stipulated sanction.[65] As such, the statement is not controlling,[66] and *Rotenberg* does not compel finding a Colo. RPC 8.4(b) violation.

Discipline for first-time misdemeanor violations is a slippery slope: if a single misstep is sufficient to impose discipline, there will be unlimited areas of lawyer regulation. Protecting the public is a laudable aspiration but in my view, our criminal courts are well situated to do so. Colo. RPC 8.4(b) requires a connection between the conduct and the lawyer's professional duties. Here there are none: no indication that Respondent's clients were dissatisfied or harmed in any way. No prior alcohol offenses to indicate a pattern. In fact, Respondent has been practicing law over the course of four decades without a documented issue. In short, there is no evidence to indicate that Respondent's professional duties have been or will be compromised in any way. Simply put, the People have not proved a connection between Respondent's single DUI conviction and his fitness to practice law. Accordingly, I would find that Respondent did not violate Colo. RPC 8.4(b) or C.R.C.P. 251.5(b).

**64.** 911 P.2d at 643.

**65.** *Id.* at 642-43.

**66.** *See Main Elec., Ltd.,* 980 P.2d at 526. Indeed, a number of the cases in which lawyers have been disciplined for DUI convictions are cases in which the Colorado Supreme Court simply agreed to stipulations tendered by the parties. *See, e.g., Rotenberg,* 911 P.2d at 643; *People v. Doolittle,* 713 P.2d 834, 835-37 (Colo. 1985). Such opinions lack binding force. *See In re Dann,* 960 P.2d at 423.